RANDY S. GROSSMAN
United States Attorney
ALLISON B. MURRAY
California Bar No. 328814
Special Assistant U.S. Attorney
U.S. Attorney's Office
880 Front Street, Room 6293
San Diego, CA 92101
Tel: (619) 546-9711
Email: Allison.Murray@usdoj.gov

Attorneys for the United States

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> JOSE SANTIAGO FRANCO-RODRIGUEZ (1), <br> ALEXI CARABALI-RODRIGUEZ (2), <br> JHON FREDY MONTANO (3) <br><br> Defendant. | Case No.: 22-CR-0797-TWR <br><br> **UNITED STATES' OMNIBUS SENTENCING MEMORANDUM AS TO DEFENDANTS 1, 2, AND 3** <br><br> Date:  May 5, 2023 <br> Time: 9:30 a.m. <br><br> Honorable Todd W. Robinson |

The UNITED STATES OF AMERICA, by and through its counsel, Randy S. Grossman, United States Attorney, and Allison B. Murray, Special Assistant United States Attorney, hereby files its Omnibus Sentencing Memorandum as to Defendants Jose Santiago Franco-Rodriguez, Alexi Carabali-Rodriguez, and Jhon Fredy Montano. This memorandum is based upon the files and records of the case.

## I.    INTRODUCTION

Jose Santiago Franco-Rodriguez ("FRANCO"), Alexi Carabali-Rodriguez ("CARABALI"), and Jhon Fredy Montano ("MONTANO") (defendants) are before the Court for sentencing after pleading guilty to Possession of Cocaine with Intent to Distribute on Board a Vessel in violation of 46 U.S.C. § 70503.

1       On Monday, March 21, 2022, it was well past dark when the Maritime Patrol Aircraft first laid eyes on the defendants' go-fast vessel traveling at a high rate of speed in the Eastern Pacific Ocean. With no other vessels in the area and a position over 123 nautical miles from the nearest point of land in Panama, the defendants' vessel possessed the hallmarks of narco-trafficking. It had multiple multi-gallon fuels barrels on deck, an assortment of bales wrapped in burlap, and was operating in a known drug trafficking area. With Coast Guard Cutter SPENCER operating nearby, a helicopter was launched to hover above the defendants' vessel and command the defendants to stop. Unfortunately, audible commands in English and Spanish and blue law enforcement lights failed to compel compliance from the defendants. Equally so, warning shots ahead of the defendants' bow failed. The defendants' continued to steer their vessel at a high rate of speed to thwart law enforcement and began jettisoning bales overboard into the dark depths of the ocean. Only after disabling fire to the defendants' engine did their attempt at escape cease.

      The defendants' efforts to avoid exposure, however, did not stop there. Observed by aircrew actively working on deck after disabling fire, the defendants moved to the center of the vessel and jettisoned a few more bales. Within a matter of minutes, the defendants' vessel became engulfed in flames from the center of the vessel and its three occupants, wearing personal floatation devices, jumped overboard into the sea. Once a Coast Guard rescue boat arrived on scene, the defendants continued to resist. As FRANCO and CARABALI clung to a white bucket with their vessel in flames behind them, MONTANO swam away from the Coast Guard and resisting pleas to help him. FRANCO and CARABALI attempted to do the same, but, unable to swim and choking on ocean water, each relented and were pulled to safety. The defendants' vessel and its contents continued to burn until it sank into the ocean.

      Undoubtedly, maritime cocaine smuggling is complicated. The skill, experience, and coordination necessary to transport large quantities of cocaine on the high seas, on a 30-

foot open-style panga vessel is significant. Had the defendants not been stopped by the Coast Guard, their voyage transporting at least 40 kilograms[1] of cocaine from Colombia to Costa Rica would have lasted over a week and required navigating at least 1000 nautical miles on the open ocean. Given the length of the journey and the requirements involved, the nature and extent of their participation is significant.

As this and other events show, maritime drug smuggling is also extremely dangerous. An appropriate sentence in this case should be substantial and reflect several key sentencing principles, including the need to deter maritime drug smuggling in general, the need to deter each defendant from reoffending, and the need to protect society from the harm caused by trafficking extreme quantities of drugs. Appropriate sentencing should also discourage these ventures as they present a danger to life at sea.

As seasoned fishermen, each of the defendants were selected for—and agreed to—smuggle drugs due to their familiarity with the marine environment and their trustworthiness in carrying out the perilous task. Each possessed a lifetime of experience on the water which proved critical to operating and navigating a go-fast vessel in an environment that can best be described as austere and unforgiving. Each volunteered in return for significant payment—upwards of $30,000. Because each of these men possess marketable skills attractive for maritime smuggling and the allure of significant financial gain from these ventures will always be there, the sentence must be sufficient to deter each from reoffending.

After taking into consideration the seriousness of the offense and the remaining 3553(a) factors, including the defendants' repeated efforts to obstruct capture and distance themselves from incrimination, the United States recommends a sentence of 84 months custody, followed by 5 years of supervised release, no fine, and a $100 special assessment.

---

[1] The exact quantity originally on the vessel is unknown given that the defendants jettisoned bales overboard at night and the vessel burned and sank. Per the plea agreement, the parties agreed to a Base Offense Level consistent with 40 kilograms.

## II. STATEMENT OF FACTS

### A. The Crime

On March 21, 2021, a Maritime Patrol Aircraft (MPA) detected a go-fast vessel with two outboard engines traveling on a northerly course approximately 123 nautical miles west of Punta Ursula, Panama, in international waters. United States Coast Guard Cutter ("USCGC") SPENCER, operating nearby, acquired the vessel using a helicopter, and diverted a pursuit small boat with an embarked boarding team to intercept the go-fast vessel.

As the Coast Guard helicopter appeared overhead defendants' vessel, the helicopter ordered the vessel to stop using blue law enforcement lights and audible callouts in English and Spanish. Because the vessel and its occupants remained non-compliant to the order to stop, warning shots ahead of the go-fast vessel's bow and disabling fire to the two outboard engines on the vessel's stern were used. In the meantime, officers observed the defendants

4

near the center console actively working on deck and jettisoning bales overboard. Within minutes, a fire was started near the center of the go-fast vessel and the vessel quickly became engulfed in flames. The three defendants, wearing life preservers, jumped overboard.



With the defendants in the water, the Coast Guard acted quickly to vector their pursuit small boat to the scene. Once there, Coast Guard officers from the small boat observed three individuals barely able to tread water, two (later identified as FRANCO and CARABALI) clinging to a white bucket, and one (later identified as MONTANO) actively resisting pleas by the Coast Guard to help. MONTANO shook his head and started swimming away from the Coast Guard small boat. Behind the defendants, their vessel was quickly burning any remaining evidence of their drug trafficking activities. When CARABALI started to struggle and his head submerged underwater, the Coast Guard

5

quickly lifted him onto the small boat. He appeared briefly unconscious but regained his breath. The remaining defendants were recovered shortly thereafter.



Once each of the defendants were safely brought on board the small boat, two bales were recovered from the darkness of the water. The at-sea weight of the recovered bales, wrapped in black burlap, was calculated to be approximately 40 kilograms, and tested positive for cocaine.



6

Defendant FRANCO claimed to be the master of the vessel. When asked to provide their last port of call and next port of call, it was reported as Golfito, Costa Rica and San Jose, Costa Rica (landlocked and not a port). When asked the purpose of their voyage, FRANCO claimed they were meeting other vessels in a bale field. When asked these questions, Coast Guard officers observed what appeared to be confusion and argument among the three defendants. Investigators later learned the defendants departed from Colombia and were destined for Costa Rica. After recovery of personnel, the Coast Guard small boat searched for additional bales and stayed on scene with the defendants' burning vessel until it sank below the water line and the fire was extinguished.



**B. Defendants' Statements**

During post-arrest interviews, each of the defendants claimed that they were paid to *retrieve* bales at sea near Costa Rica. Investigators later learned that this was not accurate and that the defendants were hired to *transport* cocaine from Colombia to Costa Rica.

During presentence interviews, each of the defendants adopted the factual portion of their respective plea agreements. In post-arrest interviews, all noted financial payment in return for smuggling of cocaine, with each reporting some payment upfront and additional payment expected upon successful completion of the trip. FRANCO and MONTANO reported being offered $30,000; CARABALI told Probation he expected $9,000.

Despite FRANCO's assertions to Pretrial Services, there is no evidence that he nor either of his co-defendants were coerced or forced into carrying out this offense.

## III. THE GUIDELINES

### A. Calculation

Under USSG § 2D1.1(c)(1), the base offense level is 32. This is based on 40 kilograms of cocaine. The United States is not recommending any enhancements or reductions for role. Since this was a team evolution and the nature and extent of each defendant's participation was significant, minor role is not appropriate. There is a two-level downward adjustment for Safety Valve, and a three-level downward adjustment for acceptance of responsibility. Each of the defendants has met the requirements for Safety Valve under USSG § 2D1.1.(b)(18) and 5C1.2. Each is in Criminal History Category I per the PSR. This results in a guideline range of 70 to 87 months in custody. An upward departure is appropriate pursuant to USSG §5K2.21 given the spoliation of evidence caused by defendants' flight from law enforcement, the jettison of bales, and the fire set to their vessel. Pursuant to the plea agreement, the United States recommends a sentence of 84 months in custody. This accounts for the unique personal characteristics of the defendants, as well as the speed with which the defendants resolved this case, saving the Government resources, pleading guilty at first opportunity, and foregoing substantive pre-trial motions.

//
//
//

8

## B. Government Recommendation

Several factors justify the Government's recommendation. First, the defendants pled guilty to possession of cocaine with intent to distribute on board a vessel. They were tasked with transporting a vast sum of cocaine from Colombia to Costa Rica by sea. This coordinated voyage would take the defendants over a week to complete and would require their teamwork and distinct skillsets in navigating an open-hulled panga over 1000 nautical miles.  Had their mission been successful, the cocaine delivered in Costa Rica would have been forwarded on to the United States and would have caused immeasurable harm to the public. In return for their trusted skill, maritime smugglers are known to be paid handsomely, often several tens of thousands of dollars if successful. Payment of $30,000, as reflected in the statements of FRANCO and MONTANO, is not outside the realm of possibility for this type of smuggling.

The sophistication, complexity, and trust involved in carrying out the offense similarly influences the Government's sentencing recommendation. The defendants acted as more than mere drug couriers, as is commonly seen in this District for land-based drug smuggling crimes. In contrast to a courier tasked with making a short drive across the border, maritime smuggling requires actual expertise. Not everybody can do it. To operate a 30-ft vessel and know where to go and what course to steer, correcting for sea and weather conditions, is a genuine skill. It is not a simple matter of plugging the coordinates into Google Maps. These vessels have no auto-pilot. Navigating a vessel over a multi-day journey and rendezvousing with other vessels at sea to refuel involves exercising *judgment*. Imprecision or lack of skill can cause any number of at-sea casualties, including the vessel taking on water, its motor failing, or worse.

Additionally, in contrast to land-crossings where the courier only has the drugs for a few hours, these ventures require the defendants to be trusted with the drugs for an extended period, a matter of days and weeks. As is known from investigating these cases,

panga captains and crew are a trusted cohort and the cartels (on the sell and buy side) invest considerably to make these shipments possible. It would defy logic and common sense to let untrained and untrusted men guard the precious cargo in an environment that already carries significant natural risk. It can be assumed here that the defendants were carefully vetted.

In addition, the considerable decision-making authority that the defendants possessed while at sea influences the Government's recommendation. Out in the middle of the ocean hundreds of miles from shore, the defendants were alone in protecting and safeguarding the precious cargo. No one was there to direct their movements. They had no recruiter or manager on board. They were captains of their own ship. They only had each other to rely on. They were a team. These facts demonstrate an extraordinary degree of trust, control, and expertise not seen in typical border-bust cases, weighing strongly against a role adjustment. Correspondingly, the bold decision by the defendants to flee law enforcement and jettison cocaine overboard shows the trust, faith, and decision-making authority instilled in these defendants.

As mentioned, the United States does not believe an adjustment for role, either aggravating or mitigating, is appropriate. This was a team evolution and the burden rests with each defendant to demonstrate that he was substantially less culpable than the average participant. The defendant bears the burden of proving that he is entitled to a downward adjustment based on his role in the offense." *United States v. Dominguez-Caicedo*, 40 F.4th 938, 964-66 (9th Cir. 2022) (noting that the relevant comparators are the *actual* participants in the defendant's crime—not that of every hypothetical member of a typical drug trafficking organization). None have not met this burden. Neither FRANCO nor MONTANO nor CARABALI was less culpable than the average participant—let alone *substantially* less culpable. Each was inescapably critical in carrying out the task.

Finally, given the need to generally deter others, and specifically deter these defendants from the financial allure of maritime drug smuggling, it is essential that the sentence reflects the seriousness of this offense and the harm from trafficking cocaine on the high seas. Maritime drug smuggling cases are ripe for recidivism. This District and others often see repeat offenders. The incentive to make large sums of money for trafficking drugs, compared against the relatively low risk of being caught in an expansive ocean, must be combated with the deterrence of significant sentences.

## C. Conclusion

After considering the 3553(a) factors, the United States believes the recommended sentence of 84 months in custody, followed by 5 years' supervised release, no fine, and a $100 special assessment is sufficient but not greater than necessary.

DATED: April 28, 2023

Respectfully submitted,

RANDY S. GROSSMAN
United States Attorney

*/s/ Allison B. Murray*
Allison B. Murray
Special Assistant U.S. Attorney

11